This time we'll hear Victorinox v. B&F System. Good morning, Your Honor. May it please the Court, my name is Joseph Glessin, counsel for Appellant's B&F System and John Meyer. For nearly 30 years, B&F openly advertised, marketed, and sold multifunction pocket knives with red handles under its own Royal Crest trademark and its own Royal Crest design, with the knowledge that, one, there were multiple purveyors of multifunction pocket knives selling them with red handles, two, that Victorinox was aware of B&F's sale of red-handled multifunction pocket knives because they had displayed at the same trade shows, they were selling through the same channels of trade, they were advertising in the same places, they were marketing online with the same online marketers, and especially since 1997, knowing of this Court's decision in the Forchner v. Arrow trading case, the one we referred to as Forchner II, in which this Court specifically held that a purveyor of multifunction pocket knives could not be barred from selling them with red handles, even if it called them Swiss Army knives, and that red handles were aesthetically functional. Despite all of these facts, the District Court held that B&F was a willful infringer, awarded trouble profits and attorney's fees. That ruling was in error, and I have stressed the damages, the profits award first, not because we think that the injunction was proper, but because, frankly, the damages award here is an economic death sentence to both B&F and to John Meyer personally, who was 16 years old and a high school student when B&F started selling red-handled multifunction pocket knives. The District Court, sorry, in order to award profits, you must prove willful deception. The District Court based its finding of willful deception on the fact that, one, B&F knew that Victorinox was selling red-handled multifunction pocket knives, and two, B&F used features that Victorinox also used, like a cross and shield design. Actually, B&F's was an X and shield design with a crown on top, and multiple implements. Those facts cannot be the basis for a determination . . . But the judge also observed that B&F continued to sell after a shipment was impounded by customs. Yes. After B&F, and B&F first learned of this claim when they were impounded, B&F examined the facts, learned that there was a registered trademark, and commenced a cancellation proceeding in the TTAB. And it was only several months after that cancellation proceeding was commenced that this lawsuit was begun by Victorinox. But B&F knew in 1987 that Victorinox was challenging its sale of these items, because it got those subsequently found cease and desist letters. Correct. And it knew that B&F was . . . I'm sorry, that Victorinox was only objecting to the use of the term Swiss Army Knife, even though it had and attached to its letters copies of B&F's catalog ads that showed red handles and the royal crest design. But the only objection was the Swiss Army Knives. B&F stopped using Swiss Army Knife just because it wasn't worth fighting. Several years later, Arrow Trading Company decided to fight that issue, and this court decided that Victorinox's contention that a term Swiss Army Knife means something made in Switzerland has no basis in law. In fact, Your Honor, Judge Jacobs, you wrote that decision. So that the fact . . . even if B&F had continued to use Swiss Army Knife until such time as a determination was made on that issue, it had a right to do that. But what it clearly understood was that the only problem in what it was doing in the minds of Victorinox was the use of the term Swiss Army Knife. And in 1987, they stopped using it. If you look at the catalogs, and all of those catalogs from each year are part of the Record on Appeal, if you look at the catalogs, in 1987, the earliest catalogs referred to the knives as Royal Crest Swiss Army Knives. Later in 1987, the catalogs just say Royal Crest, excuse me, 16 function pocket knife. And thereafter, 1988, 1989, and on and on and on, never is the term Swiss Army Knife used. It's Royal Crest. And Royal Crest in large letters. Look at their packaging. They have a blister pack, which you can find in the appendix at A1874. This is a copy of that blister pack that's shown in A1874. Royal Crest, large letters. And its box, red and black box, which you can see a picture of on A1876. This is a copy of a similar box, also saying Royal Crest. It is also occasionally used a black box, which you can see on A1880. That's an example of this black box. Even the silver box, which was occasionally used that Victorinox has claimed. Victorinox clearly says Victorinox, and B&F's clearly says Royal Crest, and shows the Royal Crest design. So that clearly the determination of willful infringement was wrong. If the determination of willful infringement is wrong, now we have to start looking at latches, which we can look at anyway on damages because... Do you need the 1987 letter, the recently discovered letter, in order to rely on latches? Until we had the 1987 letter, the argument was Victorinox must have known about our use, because we were at the same trade shows. For all those reasons. Yes. Okay, but they were saying we didn't know about them. It was part of their pleading. It was something that the district court specifically noted. Is this something that you asked for in document discovery and that Victorinox... Yes. Yes, we asked for all cease and desist letters and we did not get this letter. Did you specify a relevant time that would have included 1987? That's a long time ago. I do. I believe that's the case. Okay, but I would have the... They are in the appendix. So everybody was asking for documents that would have included it and nobody produced it. Nobody produced it. Remember, we are talking about a letter from a long time ago. I'm not saying that Victorinox found that letter and willfully refused to produce it. Maybe they didn't have it anymore. It is possible that they didn't have it anymore. Okay, but they can't... My client had it, if you will, by accident. What they did was they searched all the records where they keep their legal documents. That letter should have been there. The only reason they found it had something, nothing to do with the document request in the trademark case. It had to do with the next appeal that you're going to have to deal with, which deals with the disqualification motion. When William Meyer was saying, how long have I been using these attorneys? And he went down and he looked at Jack Hansen's old general correspondence files, from which all the legal documents should have been filled. And he said, oh my God, look what I found here. Okay, he found this letter. Okay, and I think they used reasonable diligence to find that letter. It only was found by accident as a result of something not related immediately to the document request in the trademark infringement action. And it certainly dots the I and crosses the T because it shows that they had actual knowledge. And give me again the arguments that you're most proud of that the violation was not willful. Well, multiple third party uses throughout the years. We put in, and presently, and presently, we put in numerous examples of multifunction pocket knives with red handles. Second, this saying that you cannot bar a third party purveyor, even one who's been found guilty of unfair competition, from using red handles. You have to be able to use red handles because that's what multifunction pocket knives look like. They have red handles, they have multiple tools, and an awful lot of them have some sort of shield design. So I think the third BNF's continuing use, and this court's reported decision in Fortner II, I think are the strongest arguments that BNF was acting in good faith. What does the record show that one would have seen if he went to these trade shows? If you take a look in the appendix, we have in A1627-77 are the various trade shows, listing of who is there. And in each one, there was a booth for BNF, and a booth for Victorinox, and actually a booth for Wenger as well. BNF makes many products, so does Victorinox. We also have a picture, which you can find on A1683. The way these booths work is you lay out all of your products, which would have included the multifunction pocket knives because BNF sells numerous kinds. They come with different tools. So you have the one with three tools, and you have the one with 26 tools, and such. So it's there. That's what happens at trade shows. You display your items, and you look around, and you see what your competitors are doing. Plus, they sell and market in the same places. So it was a reasonable conclusion that they knew about it. And then, of course, once we found that those 1980s... Both of you all sell on Amazon? Yes, I believe so. Yes, I know so, because I've looked for them both on Amazon. Yes. I would not want to let this argument pass without dealing with the issue of the injunction itself. Now, I believe that because of the Latch's argument that any injunction here is improper. But even with his court to find that some sort of injunction is improper, the injunction here went way beyond all that's reasonable. First of all, it effectively bars BNF from selling any multifunction pocket knives because part of the supposed trade dress of Victorinox is multiple implements that fold into the knife. Excuse me. That is what a multifunction pocket knife is by definition. Second, it's not limited to multifunction pocket knives, even though the trademark registration is strictly for multi-red handles and multifunction pocket knives. It's all products. BNF sells various other cutlery products, kitchen utensils, knife sets that you use in the kitchen, some of which have red handles and many of which are sold under the Royal Crest name and therefore the Royal Crest design. No way that that should have been included. The Royal Crest design is so clearly different from Victorinox's design that Victorinox didn't even sue based on its registered trademark for its design. Also there is a restriction that bars the defendants from making any sale, assignment, transfer of property in which they have interest with no restriction, with no limitation for the ordinary course of business and for full consideration. I don't understand what you just said. You can't sell anything. Right, right. Essentially for John Meyer to lease a car would be a violation of the injunction as written. Surely that's nonsensical. Well to modify that part of the injunction, which this court denied, we then made a motion to this court which stayed the enforcement of that part of the injunction. So clearly the district court thought that, no, you know, it wasn't just limited. You've reserved two minutes of rebuttal. Yes. We'll hear the other side at this time. Thank you, sir. Thank you, Your Honors. In police court, Rory Ratting. I'm representing Victorinox et al., the applese in this case. Before I address many of the issues raised, I would just like to indicate that this is a trademark case about intentional infringement, consumer deception and defendant's gamesmanship throughout the conduct of this case. They avoided their discovery obligations, relied on precluded documents and proffered new arguments and issues on appeal that Your Honors should not even be dealing with. And it's not simply a case about the color red. It's a case concerning trademarks owned by the Swiss company Victorinox AG involving the iconic red-handled Swiss Army knife that Victorinox created over a hundred years ago and defendants . . . Victorinox created it. 1890 . . . Well, Venger was selling it simultaneously. Venger was selling it simultaneously within living memory. And the source was the Swiss government. They had two sourcing as we do . . . So the Swiss government created it and they had to have at least two, under Swiss law, they had to have two suppliers. Two suppliers. And Victorinox created it, but they needed two suppliers. So it was created in conformance with what the Swiss government wanted for knives for its army. Correct. Correct. That's what . . . That was back in history. We fast forward. Venger is now a part . . . Speaking . . . Yes. Speaking generically, aren't there a dozen people who manufacture what anybody who goes to a shop would call a Swiss Army knife? I would hope not, but I believe that at some point in time there were, but we've been policing those knives over the years and . . . For how many years? For dating back to the . . . Certainly, for . . . Since we have evidence going back to the 70s. But you knew these people were selling this knife for at least 30 years and you didn't do anything until 15 minutes ago. That's incorrect, Your Honor. We did not know about PNF. We did not know about them all. I have to correct what Your Honor said. You said that Victorinox had sent these letters and had dealt with these letters. It wasn't Victorinox. It was Forchner. It was a distributor. We had no control over them, no privity with them at all, and so we shouldn't be hampered by what our distributor may have done, and we had no control or input into that. You own them now. As of early 2000s, we own . . . Our subsidiary owns them. Well, Mr. Larson said that these products were conspicuously displayed at trade shows. What's your take on that? Well, they weren't conspicuously displayed. For example . . . And you go to trade shows to . . . I think he's correct, but let me know if I'm wrong . . . to find out what your competitors are doing. In all these years, 30 years, you didn't know these people were selling these knives? That's correct. BNF is a seller of 2,000 items, not just these knives. This is 2 percent of their market. He referenced A1682, which is a picture of their display, which displays a lot more than knives, and I don't even think you can see the knife in this picture when you look at it in color. So I think that that's a red herring, shall I say, using the color red. It's a red herring in this whole case, and it has been from the day one of this decision . . . of this case. We, of course, we advertised. They must have advertised in various catalogs and magazines, but we never heard of these people. We didn't know about BNF. They kept under the radar. Basically, the way they worked was using drop shipments, and you didn't know who they sold to. So they would sell to retailers. They sold to people that sell on the Internet. You have no idea who BNF is. We did not learn about BNF until U.S. Customs intercepted them and gave us notice that they had intercepted a red knife and they believed it was a counterfeit. The district court alluded to that in his opinion and said that's when you learned of the shipments, and I believe the district court also said that the defendants conceded that that's when you learned. Correct. Could you explain what in the record supports that? That they conceded? Did they, in fact, concede? Yes. I believe they never challenged it. Before Judge Rakoff. Before Judge Rakoff. They never challenged it. A lot of things were not challenged before Judge Rakoff, and we're up on appeal and they're throwing a lot of things that clearly shouldn't even be reviewed by this court. They're new issues, particularly. Their position below was they should have known, not that we knew, issue. And so they basically, in essence, conceded, they did concede, that our first knowledge was in 2013. So let's go to bad faith, because Mr. Lester made a point of bad faith. Below, the defendants presenting their case primarily relied on latches. That was their whole argument as he began his argument. The court concluded that the defense was barred by unclean hands. They looked at this pattern. It's not just one isolated event. And they haven't challenged, they didn't challenge one of these facts below. It seems to me you have to rely on the idea that whatever it is they were doing, they were trying to deceive members of the public into believing that the multifunction pocket knives they were selling had its origin in Victorinox. And they were doing that. They used the word army in association with the sales. Somebody just said that the Swiss army created these things 100 years ago. Why wouldn't you call it a Swiss army knife? Victorinox created the knives to supply the Swiss army. Because the Swiss government required two suppliers. I know you've merged, but you only merged recently. Probably to put all these rights together. We acquired distinctiveness, shall we say. I'm not going to talk about the word Swiss army, but acquired distinctiveness in the terms of the look of the trade dress of the knife. And acquired it since the 70s. And since 1945 when the army officers brought them over and started calling them Swiss army. The Swiss army did not call them Swiss army. The U.S. officers started calling it, became a trademark over time. It sounds like you had a couple manufacturers of these things. Correct. It sounds like they were named, as it were, by a group of people who have nothing to do with your company. And they're red. And you can't treat color as inherently distinctive unless it's been associated in the public mind with a single source. But Wenger was making them when you were making them. That's two sources. Well, that was two sources. It was two sources. Now it's not two sources. And also we can have dual ownership, which we did with respect to the Swiss army trademark ultimately. After your Honor's decision. Yes, we have a registered mark. Just help me with this. Did they call their non-Swiss army knives B and F? Excuse me? B and F? They have over time, yes. They've also called them army, believing that they could get as close as they want. John Mayer actually made that decision that I'll use army, thinking he'd get as close as possible to the use of our marks. John Mayer did that certainly within the last, since he was the president in 2000, 2001. And were they specifically called, did they specifically call their knives Swiss army knives? They have, and they permitted their purchasers, who are retailers basically who sell these, to use Swiss army. Put the purchasers aside. Does the record reflect that? Yes. And do we know over what period of time? I believe it's over the last, again, 20 years, I think, since John Mayer became president. They call them Swiss army knives? Their retailers have. They've called it army. I'm talking about, forget about retailers or transferees. B and F. B and F has, again, adopted the name Swiss army. That's how we, that's another way we found them when they were sold, when customs found them, and then we looked on the Internet and they were being used as Swiss army. Whether it was B and F itself, but it was a B and F knife. Let me, I've been corrected, Swiss army, they were using Swiss army in the 1980s, and army since 2000 to the present, in association with the knives. In fact, one of the exhibits, A1037, that was referred to as Mr. Lessam, the royal crest box, has on it a four-piece army knife gift set in aluminum case, so as to evoke Victorinox's Swiss army name. They don't have to use that name. The question was when did they, and what you've told me, if I understand you correctly, is that Swiss army was used by B and F prior to around 2000 and not subsequently. I know for a fact that they used it prior to 2000. Subsequent to 2000, B and F encouraged, induced others to utilize it. You said that your client learned of the alleged infringement with the seizure of the custom shipment. Your adversary has said, and there seems to be substantial support in the record for the proposition, that they've been selling versions of these knives for a very long time. They point to a Second Circuit opinion that suggests that color, it's hard to claim protection for the red handle on these knives, or it could be read that way. Different parties, long time ago, but it's there. Could you marshal the evidence that you relied on before the district court to support its determination that there was bad faith here? Yes. There was element for element copying. I'm sorry? Element for element copying. Element for element copying of the look of the knife. How is that different than any other kind of knockoff? Knockoffs are permissible. Red is red. Not of trademarks. You're entitled to, I mean, you don't have a patent on putting different blades in a single housing. It's not the knife. It's not the knife. The trademark is the scales, the red scales with curved edges. That's the trademark, the registered trademark. That's the cover? Excuse me? The red scales. Scales. Scales are the handles. They're kind of plastic handles. It's not the knife, per se. That's a trademark. It's the red handles that are on it. They are, the element is, the judge defined it as two elongated oval-shaped red scales with curved edges. That's the registered mark. And that has secondary meaning. It's acquired secondary meaning. Doesn't every pocket knife have two oval curved edges forming a housing for the knives that are inside it? Not everyone. Not everyone. And not everyone has it in red. And not everyone has it in red. Before we get to red. Okay. A multifunction knife without having a housing that contains it, and if it's plastic, which would seem to be the cheapest way of doing it, and having it oval doesn't really strike me as anything that somebody can't knock off. The Letterman Knife Company doesn't use it, and they have a multifunction knife. Well, maybe they're not knocking it off to the extent that BNF is, but why can't they knock off your knife? Because it's protectable as a trademark. It's been utilized for a number of years. It's gained secondary meaning over the years. It's been registered as a presumption of validity as a result of the registration. We've also been ---- Any color red? Well, I would say, in our instance, we believe that we have a penumbra around the registration that enables us to, for infringement purposes, to capture a wider swath of red. Do they use this? Does BNF use the same shade of red? They say they don't. I'm not too sure about that. Well, we don't have a finding then. Right. So, in fairness, you would concede that they may use a different shade of red. They may not use ruby red. They may not use ruby red. Isn't there something useful about having a red knife if you're going to take it into the woods and have it in your pocket, in your kit? Other colors are sufficient. You don't need to deplete the whole world to do it. The red knife has been a traditional knife going back many, many years. It has gained secondary meaning. And in terms of the period of time when Victorinox was not the only manufacturer of it. And, indeed, it was designed by the Swiss government. But both Benger and Victorinox joined forces before the merger to obtain a trademark. To exclude other people. Excuse me? To exclude other people. That was not the purpose. The purpose is to register a well-known trademark. A well-known trademark. We see them all over. You know that this is a trademark, and you know who the source is. It's a source identifier. That's the whole purpose of trademarks. So, the consumer sees a knife and says, that's Victorinox. That's right. Or Benger. Correct. Well, they could see Benger today, but they're owned by the same source. It comes from the same source. That's the point. Returning to the evidence of bad faith. Yes. So, you have element by element copying. Defendants certainly had prior knowledge of our knives. Defendants continued to sell the knives under John Meyer's instructions, without the advice of counsel, after intervention and seizure by the customs. Defendants, their manufacturers and retailers, which I've been mentioning, have all used the Mark Swiss Army in connection with the sales. John Meyer chose to sell the knives under the name Army because it was his testimony, because it was as close as he thought he could go. He didn't want to hit Swiss, so he just used Army. Defendants have engaged in this pattern of copying other Victorinox products. The repeated efforts to apprise, the judge said, repeated efforts to approximate all of our products. They have a number of products that they're putting our trademark on. Like the knife that has the clock on the handle? Well, there's the knife that has the clock on the handle, but also there's a Swiss Army watch and other items that they've been kind of shadowing us, in a sense. When we come out with a product, they'll come out with a product, too. They'll go to China, get somebody to make it, and bring it to the United States. This is about consumer deception. There's a bit of consumer deception. These are lower-quality knives, and I think that there's a serious problem. Other things are there's serial infringers. We've been able to locate just at least seven cases that have been filed for designed trademark infringement. And finally, in this case, defendants went to the extreme of surreptitiously recording a Victorinox sales employee in Switzerland to try to trap them into some kind of admission against interest, which I think, as my old partner would say, it's the gestalt. It's the entire view of their pattern of conduct. It is only on appeal that they now are trying to refute it. They never refuted any of these facts below, none of them. But it's not just one of the isolated facts that you need to look at. It's the totality of the circumstances. Thank you. We'll hear more about it. Okay. Thank you. First, BNF has not used Swiss Army knife since 1987, period. It uses Army on one set. If you look through the catalog, and I cited there are hundreds of pages of the catalog, Royal Crest 16-function knife, Royal Crest 23-function knife. It's Royal Crest they mark it in. Does your client seek advice of counsel after the custom seizure? My client elected not to assert advice of counsel as a defense because it's counsel. You waive the privilege.  Right. The statement that BNF encouraged and induced its retailers to use Swiss Army knife, there is zero evidence of that in the record. Is there a finding of it? There is certainly not a finding. There is certainly not a finding. Is there a finding by the district judge? There is certainly no such finding. Okay. We conceded that Victorinox didn't know about us. We didn't have proof of actual knowledge until we found the letters, but we certainly made a major argument about all the reasons why they must have known, so we certainly didn't concede it. Now, when Forchner sent that letter in 1987, which is not in the record, but we're all talking about it, was Forchner the exclusive distributor in the United States for Victorinox and Wenger? Yes. No, for Victorinox. Wenger had its own distributor. Remember, there were different companies then. Yes. In fact, they sued each other. And, of course, VSAI, Victorinox, Swiss Army, Inc., is one of the parties to this action and is Forchner. Does the record reflect who Theo Klein is? Who? Theo Klein. I don't know. Okay. Let me deal with the serial infringer stuff. In only one of those cases was there any admission of liability and any payment of anything other than nominal damages. Look, when you sell 2,000 products and you've been around for 65 years, you're going to get cease and desist letters. It happens. And then you make a decision. Is this worth fighting or is it not worth fighting? And if it's not worth fighting, you settle. Okay? They're not serial infringers. To try and avoid the real facts in this case, we get nonsense like the argument that Victorinox made that our bad faith, BNF's bad faith is shown because they infringed a Gucci trademark that Gucci obviously didn't consider infringement because they never sent a cease and desist letter and they never sued. They're also asserting various infringement claims about things that nobody has asserted infringement claims. It's obvious that if it's cheaper to back off than to get involved in a litigation, people will back off. Absolutely, even when they feel they're right. You don't have to argue the point. I mean, we've all been around the block here. And one last thing, okay? They talk about how red handles have acquired distinctiveness. Well, in fact, their application to register red handles as a trademark was refused. They got a final refusal from the PTA. And six months later, they asked for reconsideration. And it was in that reconsideration application that they made that false statement that is a huge part of the cancellation proceeding, where they said that red handles have been judicially recognized as having acquired secondary meaning, citing the lower court case in Forchner II with the statement that it was affirmed, which it was. But what you wouldn't know from that was that, in fact, the district court elected, notwithstanding a statement in its decision, not to enjoin the use of red handles. It was Forchner that appealed, and this court that said that red handles do not have secondary meaning. They have a mark. They have a mark. They got that mark through a fraud on the PTO, which is why there is a kind of a — That's far afield. We don't take appeals from that. But basically, they have a mark on ruby red handles. They do. But the counterclaim for cancellation, which was dismissed by the district court, is part of the appeal here. And so that issue is in front of the appeal. And at the very least, there is an issue of fact there. That was not a summary judgment issue to dismiss the cancellation proceeding. Thank you. Thank you both. We'll reserve decision.